**CV 13 - 3306**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JAZMIA INSERILLO,

                  Plaintiff,

     -against-

CITY OF NEW YORK, RAYMOND W. KELLY,
in his capacity as Police Commissioner of the City
of New York, LT. JASON MARGOLIS, individually
and as a New York City Police Officer,
CATHERINE LAMSTEIN, individually and in
her capacity as a psychologist employed by the
New York Police Department, D.I. CHARLES
MCEVOY, SGT. DANIEL SWEENEY,
DET. MICHAEL BAHRENBURG, and
DET. KARL SCHAEFER,

                  Defendants.
-----------------------------------------------------------------X

**COMPLAINT**

Jury Trial Demanded

DEARIE, J.

POLLAK, M.J

       Plaintiff JAZMIA INSERILLO, by her attorney, Rae Downes Koshetz, for her

Complaint alleges as follows:

## INTRODUCTION

1.     This is an action pursuant to Title VII of the Civil Rights Act of 1964, the

Americans with Disabilities Act, and New York State and New York City Human Rights

laws seeking damages for sexual harassment, retaliation, and for being falsely regarded as

disabled by alcoholism.

2.     Plaintiff is a well regarded and high performing female New York City Police

Officer whose career crumbled after she made an internal complaint against a male

lieutenant who sexually harassed her and other female officers. Within days of making

her complaint, she began receiving Command Disciplines for minor infractions. The

subject of her complaint, notified of her action, began making remarks and taking

supervisory actions that communicated his displeasure with her. An anonymous person scrawled the word "bitch" on her locker. Her colleagues shunned and ridiculed her.

3.      As the retaliation snowballed, her stress increased until, after emergency room treatment of breathing problems brought on by a disciplinary interrogation, she was ordered to be interviewed by an NYPD psychologist, who falsely reported that Plaintiff was an alcoholic in need of treatment. When she refused to "volunteer" for an outpatient treatment program, she was suspended and brought up on disciplinary charges. Although she eventually complied because she could not afford to be suspended without pay any longer, she was put through months of unnecessary, expensive and humiliating "treatment," including sessions at a private facility to which the NYPD makes numerous referrals, and transferred, on disciplinary duty status, to a so-called "VIPER" unit, one of several make-work dumping grounds that serve as "gulags" for police officers in trouble.

4.      Although the NYPD's internal Equal Employment Opportunity command substantiated her complaint of harassment, it failed to substantiate her claim of retaliation.  The harassing lieutenant was transferred, informally disciplined, and sent to a lecture on courtesy, but Plaintiff was suspended and awaits an internal hearing that could end her career.

## PARTIES, VENUE, JURISDICTION

5.      Plaintiff JAZMIA INSERILLO is a female person and a New York City Police Officer who resides in Nassau County, State of New York.

6.      Defendant CITY OF NEW YORK ("City") is a municipality organized and existing under the laws of the State of New York and employing many thousands of persons in various capacities. At all times relevant hereto, Defendant City, acting through

the NYPD, was responsible for the policies, practices, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of the NYPD personnel. In addition, at all relevant times, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and of the State of New York.

7.    At all times relevant hereto, Defendant RAYMOND W. KELLY was the Police Commissioner of the City of New York, with offices at One Police Plaza, in the City and County of New York, acting in the capacity of agent, servant, and employee of Defendant City, and within the scope of his employment as such.

8.    At all times relevant hereto, Defendant JASON MARGOLIS was a Lieutenant in the employ of the New York Police Department. Defendant CATHERINE LAMSTEIN was a psychologist employed by the New York Police Department at its Psychological Services Division at One Lefrak Plaza, Corona, Queens, New York. Defendant CHARLES MCEVOY was the commanding officer of the 103 Precinct of the New York Police Department.

9.    At all times relevant hereto, Defendants SGT.DANIEL SWEENEY AND DETECTIVES MICHAEL BAHRENBURG and KARL SCHAEFER were New York City police officers assigned as "counselors" at the New York Police Department's Counseling Services Unit, located at 189 Montague Street, Brooklyn, New York.

10.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a) (3) and (4), 1367 (a), and the doctrine of pendent jurisdiction.

11.     Because many of the acts complained of occurred in Brooklyn and Queens, in the Eastern District of New York, venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## HISTORY OF THE LITIGATION

12.     On or about June 22, 2012, Plaintiff lodged a formal complaint with the United States Office of Equal Employment Opportunity (EEOC). On March 22, 2013, the EEOC issued a Right to Sue letter. This complaint is timely filed within 90 days of receipt of the Right to Sue letter.

## FACTS

13.     Plaintiff entered the Department on January 10, 2005, when she was 22 years old. After her training, she was assigned to patrol in the 103 Precinct, in Jamaica, Queens. Her performance as a rookie officer was well reviewed, and her only discipline was an informal "Warned and Admonished" for two minor rule book violations arising from a single incident.

14.     Sometime in 2006, the quality of Plaintiff's work life was dramatically impaired upon the arrival of Defendant Margolis ("Margolis"), assigned as day tour platoon commander. Margolis, who was then president of the NYPD Shomrim Society, a fraternal organization of Jewish members of the Department, bragged openly that he wielded influence at Headquarters and repeatedly referred to the Chief of Department, the NYPD's highest ranked uniformed member, as "my boy."

15.     The first time Defendant Margolis gave Plaintiff a ride in his Department vehicle from her foot post on patrol, he drove her to his residence and invited her inside, saying that his wife was not at home. She refused. After that, he invited her out to bars and to

4

parties, and engaged in inappropriate physical contact, such as touching her leg while both were in a patrol car. None of these actions was welcome and all of them were offensive to Plaintiff. He told Plaintiff and other women in the command, "If you play the game, I'll take care of you." When Margolis was assigned to the precinct desk, he often had Plaintiff stay with him and made inappropriate comments about her body.

16.      In September 2009, Plaintiff suffered a dislocated shoulder while helping to restrain an aggressive suspect during a prisoner transport. From December 14, 2009 until April 19, 2011, she was assigned on restricted duty to the NYPD Medical Division.

17.      On her first day back at the 103 Precinct, Margolis grabbed her in an awkwardly extended hug that forced her to tell him, "Okay, okay, that's enough." He responded that she did not seem happy to be back; she did not respond. He telephoned her later that evening, while she was off duty, to ask if something was bothering her. Plaintiff told him that if his call was not work-related, there was no need for him to telephone her.

18.      A few weeks later, in the station house Margolis approached Plaintiff from behind and began massaging her shoulders, stating, "Cheer up. Is the honeymoon over already?" She moved away from him and rolled her eyes to signal her displeasure. Margolis responded, "What's the matter? You like white guys, don't you?" Because Plaintiff is African-American and was newly married to a Caucasian man, she interpreted Margolis' comment as an inappropriate remark about her personal life.

19.      Plaintiff's interpretation was confirmed a couple of weeks later, when Margolis told her, "I can't believe you married an Italian guy," adding, "He couldn't at least be Jewish like me?" Sometime in June 2011, Plaintiff asked Defendant McEvoy

5

("McEvoy"), the commanding officer of the 103 Precinct, if she could avoid day tours because she did not want to be around Margolis. McEvoy took no action on her behalf.

20.    On June 22, 2011, Margolis, during a routine signing of Plaintiff's memo book, asked her if she was mad at him. "Why would I be mad?" she replied. "I don't know," said Margolis, but you better straighten up, Missy." He then rubbed Plaintiff's back and walked away.

21.    Several weeks later, Margolis again asked Plaintiff if her honeymoon was over, adding, "Come on, really? He's a corn husker for God's sake," an apparent reference to the fact that Plaintiff's husband was raised in Nebraska.

22.    Throughout that summer, Margolis communicated to Plaintiff that her rejection of his advances carried unpleasant consequences. At various times he split her from a partner she was working with, changed her post, told her she had to "play the game" to get permission to take "lost time" and leave early,  and claimed to be checking to be sure she was wearing her bullet-proof vest when he suggestively ran his hands across her back.

23.    On September 6, 2011 Plaintiff made an anonymous complaint against Margolis to the NYPD's internal Equal Employment Opportunity ("EEO") office. She made the complaint to an EEO sergeant via telephone, and refused several requests to give her name, stating that she wanted to seek legal advice.

24.    A day after Plaintiff made her anonymous complaint, Plaintiff's partner was notified to report to EEO by the same sergeant to whom Plaintiff had made her complaint.

25.     Two days after that, Plaintiff received a Command Discipline (i.e. informal discipline imposed at the command level and limited to forfeiture of vacation days) for not having her traffic vest, even though her partner was also vestless but not cited.

26.     On September 21, 2011 Plaintiff and her partner were approached by two female sergeants from Internal Affairs (IAB), one of whom had worked with Margolis when Margolis was assigned to IAB.  The predicate for the approach was apparently that Plaintiff and her partner had found drugs in a prisoner holding cell earlier in the tour and reported their find, as required. The two IAB sergeants told Plaintiff and her partner that they would be calling the two officers' command.  When Plaintiff returned to the station house and notified Margolis of what had occurred, Margolis replied, "Really? Don't worry; I'll take care of it."

27.     The next day, Margolis approached Plaintiff and her partner and stated, "I took care of the whole thing with IAB; I squashed it. Don't worry about it. No one is getting a C.D. (Command Discipline)." Plaintiff was puzzled by this, as the two officers had done nothing wrong. As they left the muster room, Margolis added, "But they did say you ladies were a bit rude to them."

28.     On September 30, 2011, Plaintiff, but not her partner, received a C.D. for discourtesy to the aforementioned IAB sergeants.

29.     During the first two weeks of October, 2011, Margolis refused Plaintiff a meal break, scrutinized Plaintiff's memo book for an inordinately long time, and asked, "You're not too happy with me lately, are you?"

30.     On October 13, 2011, Plaintiff, accompanied by her then counsel, made a formal complaint at the NYPD EEO office.

31.     Within days, Defendant Margolis had communicated to other members of the command that Plaintiff had made trouble for him.

32.     Frightened and stressed, as well as newly diagnosed with high blood pressure by her personal physician, Plaintiff told her command at the end of November 2011 that she intended to resign. When McEvoy called her into his office to ask about her decision, Plaintiff referenced her difficulties with Margolis. McEvoy responded, "What do you want me to do? He's an asset to the command." Plaintiff did not resign, but her troubles mounted.

33.     On December 5, 2011, Plaintiff and a fellow officer, whose identities were concealed, gave an interview concerning their victimization by Margolis that was aired by a network television news station and a radio station.

34.     On December 20, 2011, Plaintiff was verbally accosted in the female locker room by P.O. Teresa Callahan, who accused Plaintiff of being the reason why Margolis and his wife were sleeping in separate beds, and called Plaintiff crazy. Plaintiff told her to shut her mouth and mind her own business. On December 22, 2011, Callahan criticized Plaintiff and impugned her sanity to other officers within Plaintiff's earshot, one of whom made a formal complaint that Plaintiff had tried to "goad" her.

35.     On December 22, 2011, Plaintiff was notified that she would be formally questioned concerning the verbal altercation that had occurred that morning. Upon hearing this, Plaintiff began to experience trouble breathing, and was taken to the North Shore University Hospital emergency room, where she was treated and released. The disciplinary interview was rescheduled for the following Tuesday.

36.     On December 24, 2011, Plaintiff found that someone had scrawled the word "bitch" across a prayer verse that Plaintiff had affixed to her locker.

37.     On December 27, 2011, Plaintiff reported for the continuation of her disciplinary interview regarding the aforementioned argument, an incident that was later closed out as unsubstantiated. Shortly thereafter, her firearms were confiscated and she was ordered to report to the Medical Division for a psychological evaluation.

38.     After waiting for more than two hours, she was seen by Defendant Lamstein ("Lamstein"), a psychologist employed at the Medical Division. At the beginning of the interview, which was interrupted by several cellular telephone calls that Lamstein took in Plaintiff's presence, Lamstein told Plaintiff that Plaintiff had been ordered there because of an "anxiety attack" and suggested that it might be alcohol-related. Plaintiff communicated to her that although she was angry and upset that she had been sexually harassed and was being retaliated against, she did not have a problem with alcohol.

39.     Despite Plaintiff's unequivocal denial of alcohol abuse, Lamstein generated a one-page typewritten report that quoted Plaintiff as readily admitting alcohol abuse and as reciting for the psychologist in precise detail  the amount and content of alcoholic beverages she had consumed as long as seven years prior to the interview. Plaintiff was stunned to read this report when it was finally disclosed to her, and has consistently denied that she ever gave this account to Lamstein.

40.     On January 4, 2012, Plaintiff was ordered to report to the NYPD Counseling Services Unit at 189 Montague Street, Brooklyn. During that visit, she was called into an office with Defendants Michael Bahrenburg ("Bahrenburg"), Karl Schaefer ("Schaefer"), and Daniel Sweeney ("Sweeney"). She asked for legal representation and was told that

she was not entitled to be represented because this was an "informal interview." She asked to record the interview, and was told by Sweeney that if she did so, she could be arrested and charged with a felony because the facility was "federally protected." She was then told that she would be placed in an in-patient alcohol treatment program. Plaintiff repeatedly denied alcohol abuse, then was given the option of out-patient treatment, which Plaintiff again refused. She was eventually allowed a day's adjournment to appear with counsel.

41.     The following day, after she consulted with counsel, she was formally ordered to sign a "voluntary" contract consenting to treatment for alcohol abuse. She refused, and was immediately suspended without pay for 31 days.

42.     On February 6, 2012, Plaintiff was restored to modified assignment, the duty status of police officers with pending disciplinary cases, assigned to PSA 9/VIPER 3, and told that she would be re-suspended if she again refused to sign the treatment agreement she had refused to sign a month before.  She also was served with formal Charges and Specifications accusing her of refusing to follow a direct order. Unable to tolerate another unpaid suspension, Plaintiff finally signed the document against her will.

43.     The next day, Defendant Schaefer ordered Plaintiff to make an appointment at the outpatient facility of Seafield Services, an alcohol rehabilitation center, in Mineola. He also directed her to make an appointment to see Lucille Rosen, a private therapist who takes referrals from the NYPD.

44.     On February 8, 2012, Plaintiff reported to Seafield's Mineola facility for a supposedly independent assessment. She was interviewed by Patricia Foglia ("Foglia"), a

counselor who informed her that Schaefer had told her that Plaintiff had a pending lawsuit against the NYPD. In fact, Plaintiff had filed no lawsuit.

45.    At the conclusion of the assessment, Foglia told Plaintiff that she did not appear to be a candidate for Seafield's program, but that since the NYPD had sent Plaintiff there, they would collect and analyze Plaintiff's urine and presumably refuse to treat her if the results were negative, which they turned out to be.

46.    Nonetheless, on February 9, 2012, Foglia called Plaintiff and told her that Plaintiff indeed would be admitted into the program. When Plaintiff asked what the basis for this decision was, Foglia answered, "based on the information that you gave to the NYPD."

47.    Plaintiff thereupon began complying with the numerous interviews and other requirements associated with participating in outpatient treatment. On February 16, 2012, Plaintiff was asked to meet with Kieran Dwyer ("Dwyer"), the executive director of the Mineola facility. Dwyer said that NYPD Counseling Services Unit personnel had informed her that Plaintiff had a pending lawsuit and that they were suspicious that Plaintiff was taping conversations at the center.

48.    Although Dwyer had assured Plaintiff in early February that her "treatment" would last for only four weeks, at the end of the month she was told that she would be in the program for much longer. This unnecessary treatment, which included psychotherapy, multiple supervised urine collections, attendance at Seafield, Alcoholics Anonymous meetings, and sessions at the NYPD Counseling Services Unit, would in fact last for 26 weeks.

49.     During the entire time she was in treatment, Plaintiff's urine never disclosed alcohol use, and no other psychologist, either private or employed by the Department, indicated to her that she had an alcohol problem.

50.     Although Plaintiff's repeated denials that she belonged in alcohol treatment and her unwillingness to fabricate admissions of overindulgence tended to antagonize staff members of the programs she was forced to attend, she was apparently on track to finish her treatment until April 24, 2012. On that day the Seafield counselor who had been supervising all of Plaintiff's urine collections, one Doris Ann Caporaso, informed Plaintiff that her test results for April 10 and April 17, 2012 had shown low levels of creatinine, a principal component of urine. She explained that low creatinine could indicate a deliberate effort to dilute the specimen to avoid detection of alcohol consumption.

51.     Not only did Plaintiff deny having deliberately diluted her own urine, but also throughout her treatment, she had taken issue with the collection and preservation protocols, or lack thereof, employed by Seafield. On one occasion she was asked to add more of her urine to a partially filled cup in which she supposedly had tried to void, even though the cup had not been sealed or secured in any way in the meantime. On another occasion, the counselor took Plaintiff's unsealed sample into the counselor's own office, out of Plaintiff's view, rather than proceeding directly to the collection station which was in the opposite direction. At no time was Plaintiff asked to sign or witness sealing of her sample before it left her custody to be analyzed.

52.    On April 26, 2012 Schaefer and Bahrenburg told Plaintiff that she would have to begin a 12-week program all over again because the Department surgeon needed to see "consistent" results for that time.

53.    Finally, on June 22, 2012 Plaintiff was allowed to end her treatment at Seafield, but she was ordered to continue to submit urine samples and attend meetings at the Counseling Services Unit until August 24, 2012.  Between February and June, 2012, she had been forced to attend a minimum of two AA meetings, two outpatient sessions, and meetings with private therapists every week. She had to make claims under her own health insurance, pay the co-payments that insurance did not cover, and foot the expense of traveling to various locations under threat of suspension and termination from the NYPD.  She was labeled an alcoholic, reassigned to a dreary and unsanitary workspace that functions as a scarlet letter for any police officer, and submitted to formal NYPD discipline.

54.    By letter dated January 16, 2013, the NYPD EEO command notified Plaintiff that it had finally completed its investigation. They substantiated Plaintiff's complaint against Margolis but rejected Plaintiff's claim that the NYPD retaliated against her. According to the letter, Margolis was transferred, given an informal Command Discipline with a penalty of ten vacation days, and ordered to attend a "Professionalism in the Workplace" seminar at the Police Academy. Plaintiff, however, already had been suspended without pay for 31 days for refusing to follow an illegal order, and faces a formal internal disciplinary hearing that could result in her termination.

55.    Margolis' misbehavior toward multiple women in the command was an open secret during both periods of time when Plaintiff was assigned to the 103 Precinct.

Brazen and claiming protection from higher-ups at Headquarters, he carried on as detailed in the preceding paragraphs in the presence of at least one lieutenant and multiple sergeants. No fewer than seven other female officers, including a sergeant, told Plaintiff that they, too, had experienced similar problems with Margolis.

## FIRST CAUSE OF ACTION
## SEX DISCRIMINATION

56.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 55 as if fully set forth herein.

57.     During the times set forth above, in the course of Plaintiff's employment by Defendant City of New York, Defendant Margolis, individually and acting in his supervisory capacity as Lieutenant of Police and an employee of the City of New York, unlawfully discriminated against Plaintiff in the terms, conditions and privileges of her employment in various ways, in substantial part because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* Among other things, Defendant Margolis engaged in *quid pro quo* sexual harassment of Plaintiff by subjecting her to unwanted remarks of a sexual nature and offensive touching while making it clear to her that the terms and conditions of her employment were contingent upon tolerance of his unwanted acts.

58.     As a result of the sexual harassment perpetrated by Defendant's agent, Defendant Margolis, and Defendant City's failure to protect Plaintiff from such discrimination, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## SECOND CAUSE OF ACTION
## SEX DISCRIMINATION

59.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

59.    During the times set forth above, Defendants New York City, Margolis, Kelly, and McEvoy discriminated against Plaintiff in regard to the terms, conditions or privileges of her employment in substantial part because of her sex, in that they either committed, enabled or tolerated sexual harassment of Plaintiff by Margolis, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*.

60.    The above-described unwelcome sex discrimination, which was offensive, continuing, intimidating, severe, and pervasive, interfered with Plaintiff's emotional and physical well-being.

61.    As a result of the hostile and offensive work environment perpetrated by and/or allowed to persist by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## THIRD CAUSE OF ACTION
## SEX DISCRIMINATION

62.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 61 as if fully set forth herein.

63.    During the course of Plaintiff's employment by Defendant City of New York, all Defendants, including City of New York and its agents and employees unlawfully retaliated against Plaintiff for her internal and external complaints of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§2000e *et seq.*. Defendants, *inter alia*, instigated, perpetrated and/or tolerated the initiation of retaliatory

discipline and wrongfully forced Plaintiff to undergo treatment for alcoholism, when in fact she is not and never has been an alcoholic.

64.     As a result of the unlawful retaliatory acts perpetrated by and/or allowed to persist by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## FOURTH CAUSE OF ACTION
## SEX DISCRIMINATION

65.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 64 as if fully set forth herein.

66.     During the times set forth above, in the course of Plaintiff's employment by Defendant City of New York, Defendant Margolis, individually and acting in his supervisory capacity as Lieutenant of Police and an employee of the City of New York, unlawfully discriminated against Plaintiff in the terms, conditions and privileges of her employment in various ways, in substantial part because of her sex, in violation of New York Executive Law §296(1)(a) ("The New York State Human Rights Law"). Among other things, Defendant Margolis engaged in *quid pro quo* sexual harassment of Plaintiff by subjecting her to unwanted remarks of a sexual nature and offensive touching while making it clear to her that the terms and conditions of her employment were contingent upon tolerance of his unwanted acts.

67.     As a result of the sexual harassment perpetrated by Defendant's agent, Defendant Margolis, and Defendant City's failure to protect Plaintiff from such discrimination, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## FIFTH CAUSE OF ACTION
## SEX DISCRIMINATION

68.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 67 as though fully set forth herein.

69.    During the times set forth above, Defendants New York City, Margolis, Kelly, and McEvoy discriminated against Plaintiff in regard to the terms, conditions or privileges of her employment in substantial part because of her sex, in that they either committed, enabled or tolerated sexual harassment of Plaintiff by Margolis, in violation of New York Executive Law §296(1) (a) ("The New York State Human Rights Law").

70.    The above-described unwelcome sex discrimination, which was offensive, continuing, intimidating, severe, and pervasive, interfered with Plaintiff's emotional and physical well-being.

71.    As a result of the hostile and offensive work environment perpetrated by and/or allowed to persist by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## SIXTH CAUSE OF ACTION
## SEX DISCRIMINATION

72.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 71 as though fully set forth herein.

73.    During the course of Plaintiff's employment by Defendant City of New York, all Defendants, including City of New York and its agents and employees unlawfully retaliated against Plaintiff for her internal and external complaints of sexual harassment in violation of New York Executive law §296(7) ("The New York State Human Rights Law"). Defendants, *inter alia*, instigated, perpetrated and/or tolerated the initiation of

retaliatory discipline and wrongfully forced Plaintiff to undergo treatment for alcoholism,
when in fact she is not and never has been an alcoholic.

74.    As a result of the unlawful retaliatory acts perpetrated by and/or allowed to persist
by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of
income and damage to her professional reputation and her career.

## SEVENTH CAUSE OF ACTION
## GENDER DISCRIMINATION

75.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74
as though fully set forth herein.

76.    During the times set forth above, in the course of Plaintiff's employment by
Defendant City of New York, Defendant Margolis, individually and acting in his
supervisory capacity as Lieutenant of Police and an employee of the City of New York,
unlawfully discriminated against Plaintiff in the terms, conditions and privileges of her
employment in various ways, in substantial part because of her gender, in violation of
Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) ("The New
York City Human Rights Law"). Among other things, Defendant Margolis engaged in
*quid pro quo* sexual harassment of Plaintiff by subjecting her to unwanted remarks of a
sexual nature and offensive touching while making it clear to her that the terms and
conditions of her employment were contingent upon tolerance of his unwanted acts.

77.    As a result of the sexual harassment perpetrated by Defendant's agent, Defendant
Margolis, and Defendant City's failure to protect Plaintiff from such discrimination,
Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and
damage to her professional reputation and her career.

## EIGHTH CAUSE OF ACTION
## GENDER DISCRIMINATION

78.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 77 as though fully set forth herein.

79.    During the times set forth above, Defendants New York City, Margolis, Kelly, and McEvoy discriminated against Plaintiff in regard to the terms, conditions or privileges of her employment in substantial part because of her gender, in that they either committed, enabled or tolerated sexual harassment of Plaintiff by Margolis, in violation of Title 8 of the Administrative Code of the City of New York, §8-107(1) (a) ("The New York City Human Rights Law").

79.    The above-described unwelcome gender discrimination, which was offensive, continuing, intimidating, severe, and pervasive, interfered with Plaintiff's emotional and physical well-being.

80.    As a result of the hostile and offensive work environment perpetrated by and/or allowed to persist by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## NINTH CAUSE OF ACTION
## GENDER DISCRIMINATION

81.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

82.    During the course of Plaintiff's employment by Defendant City of New York, all Defendants, including City of New York and its agents and employees unlawfully retaliated against Plaintiff for her internal and external complaints of sexual harassment in violation of Title 8 of the Administrative Code of the City of New York, §8-107(7)

("The New York City Human Rights Law"). Defendants, *inter alia*, instigated, perpetrated and/or tolerated the initiation of retaliatory discipline and wrongfully forced Plaintiff to undergo treatment for alcoholism, when in fact she is not and never has been an alcoholic.

83.     As a result of the unlawful retaliatory acts perpetrated by and/or allowed to persist by Defendants, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## TENTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION

84.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 83 as if fully set forth herein.

85.     At the times and locations set forth herein, Defendants unlawfully discriminated against Plaintiff, whom they regarded as having the impairment of alcoholism, in the terms, conditions and privileges of her employment as a New York City Police Officer, in violation of 42 U.S.C. §12101 *et seq.* ("The Americans with Disabilities Act").

86.     Based upon Defendants' false identification of Plaintiff as an alcoholic, Plaintiff was forced to "volunteer" for alcohol treatment, disadvantageously transferred, disciplined, falsely labeled as an alcoholic, and required to undergo protracted, expensive, stigmatizing, and humiliating treatment for a disorder she did not have.

87.     As a result of Defendants' unlawful actions, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

20

## ELEVENTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION

88.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 87 as if fully set forth herein.

89.    At the times and places set forth above, Defendants unlawfully discriminated against Plaintiff in violation of New York Executive Law, Article 15 ("The New York State Human Rights Law"). Defendants, including the City of New York, an employer of more than four persons pursuant to §292 (5),    subjected Plaintiff to an Unlawful Discriminatory Practice pursuant to §296 (1)(a), in that Defendants took adverse employment action against Plaintiff due solely or in significant part to a perceived physical, mental, or medical impairment as defined by §292 (21), to wit perceived alcoholism, pursuant to §292 (21-a), when in fact Plaintiff had never been and was not an alcoholic.

90.    As a result of the Defendants' unlawful actions, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

## TWELFTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION

91.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 90 as if fully set forth herein.

92.    At the times and places set forth above, Defendants unlawfully discriminated against Plaintiff in violation of Title 8 of the Administrative Code of the City of New York ("The New York City Human Rights Law"). Defendants, including the City of New

York, an employer of more than four persons pursuant to §8-102 (5), and the co-Defendants subjected Plaintiff to an Unlawful Discriminatory Practice pursuant to §8-107 (1)(a), in that Defendants took adverse employment action against Plaintiff due solely or in significant part to a perceived mental or psychological impairment as defined by §8-102 (16) (a) and (b), to wit alcoholism, when in fact she had never been and was not an alcoholic.

93.     As a result of Defendants' unlawful actions, Plaintiff suffered humiliation, emotional distress, physical pain, loss of income and damage to her professional reputation and her career.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined after trial by way of compensatory and, where authorized by law, punitive damages, together with interest, costs and disbursements of this action and such other and further relief as this Court deems appropriate under the circumstances.

Dated: New York, New York
      June 10, 2013

RAE DOWNES KOSHETZ, P.C.

Rae Downes Koshetz (0320)
Attorney for Plaintiff
747 Third Avenue, 20th Floor
New York, New York 10017
(212) 308-2979